## Moore *v.* Osser, Appellant.

Argued September 26, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Levy Anderson*, First Deputy City Solicitor, with him *Mansfield C. Neal* and *Frank J. Pfizenmayer*, Assistant City Solicitors, and *Edward G. Bauer, Jr.*, City Solicitor, for appellants.

*David Berger*, for appellants.

*Oscar N. Gaskins*, for appellee.

OPINION BY MR. JUSTICE ROBERTS, October 2, 1967:

Appellees, candidates of the Political Freedom Rights Party, filed nominating papers in Philadelphia for the offices of Mayor and several councilmen-at-large. These papers were rejected by appellants, the Philadelphia County Board of Elections, on June 30,

1967. Ten days later appellees brought a mandamus action in the Court of Common Pleas of Philadelphia County to compel the county commissioners to accept for filing the now contested nomination papers. The court below granted mandamus.[1]

The issue before this Court, the proper construction of §951(b) of the Pennsylvania Election Code of 1937,[2] is one of first impression.[3] In pertinent part, that section provides: "In the case of all . . . [non-state-wide] nominations, the number of qualified electors of the electoral district signing such nomination papers shall be at least equal to two per centum of the largest entire vote cast for any officer, except a judge of a court of record, elected at the last preceding election in said electoral district for which said nomination papers are to be filed, and shall be not less than the number of signers required for nomination petitions for party candidates for the same office."

In the 1963 Philadelphia municipal election the highest number of votes cast for a successful city-wide candidate was 401,966 for the office of mayor, two per cent of which is 8,039. In 1965, 331,133 votes were cast for district attorney, the most successful city-wide candidate, two per cent of which is 6,622. Although appellees' papers contained over 12,000 sig-

---

[1] Appellants Paul D'Ortona, John B. Kelley, Jr., William F. Boyle, Edward Cantor and Edgar Campbell filed in the court below a petition to intervene which was denied. In view of our disposition of this litigation and our treatment of all the points pressed by the intervenors, we find it unnecessary to decide whether the intervention petition was correctly denied.

[2] Act of June 3, 1937, P. L. 1333, §951(b), as amended, 25 P.S. §2911(b).

[3] Lower courts faced with this language have reached conflicting conclusions. Compare, e.g., *Hamilton's Nomination Papers*, 7 Pa. D. & C. 523 (C.P. Clinton County, 1925) (supporting appellee's position) with *Lavery's Nomination Papers*, 4 Pa. D. & C. 437 (C.P. Erie County, 1923) (supporting appellant's position).

natures, the appellants insist that only 6,801 of these are valid. The issue thus posed is whether the "last preceding election", employed by §951(b) as the base year, has reference to the 1963 election or the 1965 election in which the office of mayor was not contested. If the former, appellees' papers were properly rejected by the county commissioners;[4] if the latter, appellees must prevail.

Appellants contend that 1963 is the "last preceding election" because the phrase "for which said nomination papers are to be filed" modifies the word "election." Such a construction would render §951(b) nonsensical, for its language would then read: "the last preceding election for which said nomination papers *are to be* filed." Obviously, this construction would result in a conclusion that the Legislature juxtaposed two different temporal references, one to a prior election and one to the election for which the current papers are now being filed.

Furthermore, even were we to accept the word "election" as the proper antecedent of the disputed phrase, we fail to see how this can help appellants. Obviously the words "said nomination papers" refer to the ones filed for the *upcoming* election, not the last preceding one; and common sense tells us that *these* papers could not have been filed before they existed. In essence then, to succeed appellants must contend that the phrase "for which said nomination papers are to be filed" modifies "officer" not "election." Basic rules of grammar refute this contention as well. The antecedent of the pronoun "which" must be a thing, place or event, while the proper pronoun referring to a person would be either "who" or "whom." The pro-

---

[4] We here *assume* that the rejection of 5,238 signatures was correct, and thus find it unnecessary to treat the questionable manner in which the County Board of Elections disqualified nearly one-half of the signatories.

vision in controversy does *not* read "for whom said nomination papers are to be filed."

The natural, logical reading of the phrase "for which said nomination papers are to be filed" is as a modifier of "said electoral district." It is a basic postulate of good sentence structure to locate a modifying clause as close to its antecedent as possible, thus dictating the conclusion that "said electoral district" is the intended antecedent. Given this conclusion, the "last preceding election in said electoral district," i.e., the City of Philadelphia, must be the 1965 municipal election, the most recent election in which city-wide offices were contested. We therefore hold that §951(b) employs as a base year the most recent election, regardless of the office involved, in the particular electoral district in question.

Alternatively, appellants contend that, if their reading is not given to the phrase "for which said nomination papers are to be filed," that phrase becomes surplusage. It is clear, however, that this phrase was necessary to particularize which electoral district was referred to by the words "last preceding election." Within this Commonwealth there is a multiplicity of overlapping electoral districts. Assume, for example, that in Philadelphia a councilmanic district is composed of wards #1 and #2, although a magistrate is elected solely by ward #1; that in 1963 ward #1 elected a magistrate as well as a councilman in conjunction with ward #2; and that there were no other elections during the period of 1963-67. The phrase in dispute makes it clear that, when magistrates are to be again elected in 1967, the proper total vote to use as a base would be that cast for magistrate even though the total vote cast by the voters in ward #1 for councilman might be greater, for only as to the magisterial election did the ward #1 voters elect a candidate for "said

electoral district for which said nomination papers are to be filed."

"Good sense," according to appellants, also supports their position for they contend that the purpose of §951(b) is to accurately test voter sentiment for independent candidates and that, for example, in a councilmanic campaign the minimum voter interest required by §951(b) to nominate an independent, third-party candidate should be measured by the last *councilmanic* election. Simply, appellants insist that the proper referent would be the highest total vote amassed by any councilman-at-large. Perhaps good sense would prompt such a result, but §951(b) does not so provide, for it speaks of "any officer." Thus, if in the last election the mayor received 450,000 votes and the most successful councilman-at-large 350,000, according to appellants' theory an independent councilmanic candidate would need to obtain signatures totaling two per cent of 350,000. However, §951(b)'s use of "any officer" shows that a councilmanic candidate must obtain two per cent of 450,000.[5] Furthermore, to the extent that §951(b) is designed to insure minimal voter interest in an independent candidate, this function is served by the requirement that the number of signatures required for nomination shall at least be equal to that required of "party candidates for the same office."

One further point is pressed by appellants.[6] Section 951(e) provides that: "There shall be appended to each nomination paper offered for filing an affidavit

---

[5] Although not so articulated, appellants are obviously concerned about the phenomenon known as an "off-year" election. However, in many of our electoral districts the number of individuals reaching their majority increases each succeeding year. The Legislature, with "good sense," could certainly have decided that a better test of voter sentiment would be the most recent election rather than one of an earlier year when the voting population was smaller.

[6] Only the intervenors have raised this point.

of each candidate nominated therein . . . ." In their answer, appellants asserted that only two of the 243 nominating papers had the requisite affidavit. The court below, whose reasoning we adopt, adequately disposed of this contention: "[C]ounsel for the plaintiffs stated to the court, without contradiction, that at the time the papers were presented to the board on March 29, 1967, plaintiffs were informed by the board that a separate candidate's affidavit need not be appended to each individual petition but that the two affidavits submitted were sufficient. Whether this statement was made or not, we would so rule. . . . [§951(d)] of the Code provides for the binding together of separate nomination petitions to constitute one nomination paper. Each separate petition is required to have appended to it the affidavit of a qualified elector with knowledge of the contents, the correctness of the residences, etc., but the requirement of . . . [§951(e)] is that 'there shall be appended to each nomination *paper* offered for filing an affidavit of each candidate nominated therein.' It is our view that the 243 petitions, when bound together and numbered consecutively, became one nomination paper and required but one candidate's affidavit. Indeed, the purpose of such an affidavit is to give assurance that the candidate is eligible for the office sought, that he will not knowingly violate the law, and that his name is not presented elsewhere in nomination. One such affidavit with each nomination paper is sufficient; it is not necessary to submit 243 repetitious affidavits because the nomination paper consists of 243 petitions." (Emphasis in original.)

On oral argument before this Court, counsel for appellants frankly admitted that the nomination petitions of the two major political parties are not subject to the type of scrutiny to which the papers of the Political Freedom Rights Party were subjected. In fact, it ap-

pears that the validity of the signatures on major party nominating petitions are never checked, although independent candidates always are. We would be remiss if we did not note our disapproval of such a practice.[7]

Judgment affirmed.

Mr. Justice EAGEN concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion in this case reads like an inscription on an Egyptian monument. By a juggling of "whos," "whoms" and "whiches", the Majority Opinion leads the reader into a labyrinth of obscurity and confusion from which no enlightened exit is possible. Instead of speaking of "pronoun antecedents," "juxtaposed different temporal references," "basic postulates" and "modifying clauses" the Majority might have looked at the intent of the statute which the Majority runs through an interpretive sausage machine from which it emerges looking like the bedraggled remnants of a bundle of Chinese laundry.

While taking the reader by the hand through grammatical swamps, the Majority Opinion says that the "antecedent of the pronoun 'which' must be a thing, place or event." I call attention to the biblical precedent that "which" is not confined to the antecedent of a "thing, place or event." The Lord's Prayer begins: "Our Father which art in Heaven, Hallowed be thy name." (Matthew 6:9; Luke 11:2)

The purpose of the statute we are here considering was to allow independent electoral groups to form a new party, but at the same time to compel a reasonable number of signatures before so drastic an alteration in the normal election procedure should be permitted. Our form of government is based on a two-party sys-

---

[7] This duality of standards obviously produces administrative chaos and offends equality of treatment.

tem. Of course, as I said before, independent groups of citizens have the right to be recognized when they feel they cannot express themselves through the two-party alignment. But election regularity and an intelligent evaluation of the desires of the electorate compel strict adherence to the rules laid down by the Legislature in the Pennsylvania Election Code.

Now what did the Legislature say? It said, omitting what is not required in the interpretation, that: "In the case of all . . . [non-state] nominations, the number of qualified electors of the electoral district signing such nomination papers shall be at least equal to two per centum of the largest entire vote cast for any officer, . . . elected at the last preceding election in said electoral district for which said nomination papers are to be filed, and shall be not less than the number of signers required for nomination petitions for party candidates FOR THE SAME OFFICE." Emphasis supplied)

The guide post in this stroll down legislative lane is "shall be not less than the number of signers required for nomination petitions for party candidates FOR THE SAME OFFICE."

What is the same office involved here? The office of mayor. Cecil Moore is forming a new party to run for mayor, not anything else. The number of signatures he needs, therefore, should be compared with the total votes cast in an election when a MAYOR was being elected, not a District Attorney. In the last election for mayor, which was in 1963, the highest number of votes cast for mayor was 401,966. What is two per centum of 401,966? The answer is 8,039. Does Cecil Moore have 8,039 nominating signatures on his nomination? The answer is No. He has only 6,622. Thus he did not have enough signatures to qualify as a candidate for mayor on his new ticket.

That is all there is to it, and, therefore, I dissent.

DISSENTING OPINION BY MR. JUSTICE COHEN:

I read "the largest entire vote cast for any officer . . . elected at the last preceding election . . . for which said nomination papers are to be filed . . ." to mean that the number of nomination petition signatures necessary to qualify as a candidate for the office of mayor should be the highest vote cast for *any officer* in the last preceding mayoralty election. To hold otherwise, in my view, is to render nugatory the language "for which said nomination papers are to be filed". Contrary to the holding of the majority of this Court, I interpret "said electoral district" to clearly and unequivocally refer to the particular district in which the proposed candidate is seeking election. Consequently, to conclude that "for which said nomination papers are to be filed" modifies "said electoral district" on the basis that the phrase "said electoral district" is ambiguous, is clearly without foundation.

Since it is an axiomatic statutory rule of construction to give vitality wherever possible to every word of a statute, I am reluctantly compelled to conclude that the proper measuring rod in ascertaining the number of signatures necessary in the instant case, is the highest vote cast for any officer in the last preceding election *for mayor*.

Accordingly, I dissent.